UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA,   )<br>   )<br>   Plaintiff,   )<br>   )<br>   v.   )<br>   )<br>GREGORY ALOISIO, et al.,   )<br>   )<br>   Defendants.   )<br>   ) | C.A. No. 21-cr-27-MSM-PAS |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The Court ordered the parties to provide simultaneous supplemental briefing on two questions about the Court's past forfeiture order applying the definition of "proceeds" from 18 U.S.C. § 981(a)(2)(A). (ECF No. 238.) The parties have ably done so. (ECF No. 240, No. 241.)

Below, the Court explains why § 981(a)(2)(A) applies to this case. In short, the Aloisio Group's bank fraud was at the core of its "service," the bank fraud is "inherently illegal," and its scheme was thus an "illegal service" rather than a "lawful service" that was "provided in an illegal manner." *George*, 886 F.3d at 40. The stay on the forfeiture order is thus lifted.

I.    BACKGROUND

A jury convicted the Aloisio Group of conspiracy to commit bank and wire fraud on March 31, 2023. (ECF No. 82 at 2.) Afterward, the Government moved for an

order of forfeiture in the form of a money judgment against the Aloisio Group. (ECF No. 201.) The Government did not pursue a forfeiture against the individual defendants. *Id.* at 2 n.1.

Against the Aloisio Group, the Government sought "all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable" to its conviction under 18 U.S.C. § 1349, conspiracy to commit bank fraud under 18 U.S.C. § 1344. *Id.* ¶ 2. That included "a sum of money equal to the total amount of proceeds obtained as a result of the offenses," and the Government estimated that the sum is $493,994.54. *Id.* ¶¶ 2, 5. The Government explained that the Court should apply the definition of "proceeds" from 18 U.S.C. § 981(a)(2)(A), "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." *Id.* ¶ 4 n.2. In its view, that $493,994.54 figure fit that definition of "proceeds" because it reflected "the revenue identified by Federal Bureau of Investigation ('FBI') Financial Analyst Kathleen Brekenfeld as funds received by Aloisio Group in connection with ten of the properties involved in the defendants' multi-year scheme." *Id.* ¶ 5.

The Aloisio Group objected to the forfeiture motion. (ECF No. 213.) It argued that the Government's calculation was "fundamentally flawed because it ignores relevant and indisputable facts." *Id.* at 1–2. Those facts, it said, include the "indisputable benefits that the majority of the homeowners received through their dealings with Defendants," like avoiding foreclosure and "the resulting stain on their

credit." *Id.* at 2. And in the Aloisio Group's view, the calculation also excluded benefits that the lenders received, the overall economy, carrying costs, and other mitigating circumstances. *Id.* at 3–6. The Aloisio Group did not argue that the Government applied the wrong definition of "proceeds" in its initial motion.

After reviewing the briefing, the Court ordered forfeiture in the amount of $493,994.54. (ECF No. 236 at 4.) Applying the definitions of proceeds from 18 U.S.C. §§ 981(a)(2)(A) and 982(a)(2)(A), the Court reasoned that Agent Brekenfeld's calculation was an "appropriate benchmark" for forfeiture because it consisted of "rent payments, any option deposits paid down, shortsale feeds, and proceeds from the sale of the properties." *Id.* at 3 (quoting ECF No. 201-2 at 19). Drawing from the statutory language, the Court concluded that the sums identified by Agent Brekenfeld were "indeed money (and thus proceeds) either 'obtained, directly or indirectly,' as 'the result of the commission of the offense giving rise to forfeiture,' or otherwise 'traceable thereto' the scheme." *Id.* (quoting 18 U.S.C. §§ 981(a)(2)(A); 982(a)(2)(A)).

After the Court issued the forfeiture order, it held an on-the-record conference with the parties on July 17, 2025, about calculating restitution, a distinct (but related) issue. Toward the end of the conference, the Aloisio Group objected to the forfeiture order on several grounds—though not that the Court applied the wrong definition of "proceeds." Still, the Court viewed the Aloisio Group's objection as sort of a motion to reconsider and said it would review the forfeiture order again.

3

It did so. The Court in its review became aware of *United States v. George*, 886 F.3d 31 (1st Cir. 2018). There, the First Circuit highlighted a distinction in the forfeiture statute between "lawful goods or lawful services that are sold or provided in an illegal manner" and "illegal goods, illegal services, [and] unlawful activities." *Compare* 18 U.S.C. § 981(a)(2)(B) *with* 18 U.S.C. § 981(a)(2)(A). The First Circuit said that the distinction "can have a profound effect on the amount that may be subject to forfeiture in a particular case," because different definitions of "proceeds" apply to each. 886 F.3d at 40.

The Court took seriously the First Circuit's language about the "profound effect" this distinction can have on forfeiture. 886 F.3d at 40. Without the benefit of any briefing, the Court saw it as possible that the Aloisio Group's conduct could be "lawful services" that were "provided in an illegal manner," requiring the narrower definition of "proceeds" to apply. *Id.* Wanting to avoid a manifest error of law, the Court felt it best for the parties to discuss this previously unexplored issue. (ECF No. 238 at 2.) So the Court directed the Government and the Aloisio Group to address *United States v. George* and developments in the caselaw since. In short, the Court posed two questions to the parties:

1. Is the Aloisio Group's conduct better understood as "lawful services that are sold or provided in an illegal manner" under 18 U.S.C. § 981(a)(2)(B)?

2. Assuming the narrower definition of "proceeds" applies, how much should the Aloisio Group be required to forfeit?

(ECF No. 238 at 2–3). The Court stayed its forfeiture order while it considered the issue. Text Order, July 18, 2025. The parties then filed their briefs. (ECF No. 240, No. 241.)

## II.  DISCUSSION

The Court's discussion proceeds in three parts. The Court first provides background, then summarizes the parties' arguments, and finally analyzes the issue.

### A.  Statutory Framework

"Any property, real or personal, which constitutes or is derived from *proceeds* traceable to a violation of" conspiracy to commit bank fraud is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(C) (emphasis added). The main question before the Court is which definitions of "proceeds" from the civil forfeiture statute applies.[1] *See United States v. Carpenter*, 941 F.3d 1, 7 (1st Cir. 2019) (explaining

---

[1] The Government notes that 18 U.S.C. § 982(a)(2)(A) also applies. (ECF No. 241 at n.2.) While the Court sees no problem with the drafting error in the superseding indictment that the Government noted in Footnote 1 of its brief (ECF No. 241 at 2 n.1), given its correction later on and the notice that the Superseding indictment supplied, application of the criminal forfeiture statute still does not answer the question of how to define "proceeds."

As the Court explained last time, § 982(a)(2)(A), under the title of "Criminal Forfeiture," does not define "proceeds." (ECF No. 236 at n.1). And there is not a definition elsewhere in § 982. The Government now observes that the criminal statute "provides for criminal forfeiture of gross proceeds" under § 982(a)(2)(A), (ECF No. 241 at 2), though the Court notes that the text is not clear on that point. The Court assumes that the Government is referencing § 982(a)(8)(B), which does refer to "gross proceeds," but that section only applies to conspiracy to violate 18 U.S.C. § 1344 "if the offense involves telemarketing," which—at least as far as the Court can tell—is not relevant here. And § 982(a)(8)(B)'s reference to "gross proceeds," while § 982(a)(2)(A) just refers to "proceeds," further muddies the water. *See, e.g., Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) ("We generally seek to

5

that the "standards for determining 'proceeds' vary depending on whether the forfeiture falls under § 981(a)(2)(A) or § 981(a)(2)(B)").

Section 981(a)(2)(A) covers "cases involving illegal goods, illegal services, [and] unlawful activities." It defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). This definition sweeps broadly.

In contrast, § 981(a)(2)(B) covers "cases involving lawful goods or lawful services that are sold or provided in an illegal manner." It defines "proceeds" as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C § 981(a)(2)(B). This definition sweeps much more narrowly, allowing subtraction of "direct costs."[2]

Highlighting the distinction between these two definitions of "proceeds," the First Circuit has explained that "the classification of an offense of conviction can have a profound effect on the amount that may be subject to forfeiture in a particular case."

---

respect Congress' decision to use different terms to describe different categories of people or things.")

All that is to say: the criminal provision offers little help. As explained last time, because the First Circuit has referred to the definition of "proceeds" from the civil forfeiture statute in analyzing a criminal mortgage fraud case and statutory interpretation principles compel the same conclusion, the Court here will draw from caselaw discussing the civil provision. (ECF No. 236 at n.1.)

[2] Because the Court holds that § 981(a)(2)(A) applies, it need not delve into what "direct costs" means here.

*United States v. George*, 886 F.3d 31, 40 (1st Cir. 2018). To fall under § 981(a)(2)(B), the crime "must involve a good or service that could, hypothetically, be provided in a lawful manner," while the crimes falling under § 981(a)(2)(A) are those that are "inherently unlawful." *Id.*

To illustrate how the classification works, the Fifth Circuit has explained that there "are some service-based crimes that can never be performed legally." *United States v. Davis*, 53 F.4th 833, 854 (5th Cir. 2022). One colorful example: you "cannot lawfully make a living as a contract killer," so the definition of § 981(a)(2)(A) would apply to a case involving that conduct. *Id.* But "there are some services that, although provided illegally in one case, could be provided legally in another—like operating an HVAC school," the conduct at issue in *Davis*. *Id.*

That said, applying the correct definition of "proceeds" is hard, particularly in fraud cases. As one district court explained, the "case law provides no clear way to delineate these two categories of conduct," and the "Courts of Appeals have reported very few precedential decisions on this issue." *United States v. Percoco*, 16-cr-776, 2019 WL 1593882 (S.D.N.Y. Apr. 15, 2019), *vacated on other grounds*, 149 S. Ct. 2490 (2023); *see also United States v. Milton*, 21-cr-0078, 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024) (noting that the distinction poses a "difficult question"); *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 206–07 (D.D.C. 2014) (noting, in a wire fraud case, that "[t]he appropriate definition of 'proceeds' in this situation is not clear").

7

### B.    The Parties' Arguments

The Aloisio Group contends that the narrower definition of "proceeds" should apply. (ECF No. 240.) In its view, its self-described short sale business, property management services, and rent-to-own program are all services that could be performed lawfully. *Id.* at 5. It highlights the specific actions taken—collecting fees from homeowners, negotiating with lenders, negotiating short sales, engaging in rent-to-own contractual agreements with homeowners, and providing repairs to properties. *Id.* at 5–6. And it explains that all those services "can be provided legally." *Id.* at 6. To bolster that point, it provides authorities explaining how short sales can be conducted legally, including government webpages. *Id.* at 6–8. And it argues that the Court should not look to the title of the statutory offense, "bank fraud," as the best description of the action; instead, the Court should look at the "underlying predicate acts" that led to the conviction. *Id.* at 8–10.

The Government argues that the broader definition of "proceeds" should apply. (ECF No. 241.) Its argument works in two steps. The first step is more abstract: the Government argues that "bank fraud" is inherently illegal, because there "is no lawful way to steal from a bank." *Id.* at 6. That contrasts with other lawful businesses, like the one at issue in *United States v. Carpenter*, 941 F.3d 1, 8–9 (1st Cir. 2019). *Id.* at 5. The second step of the Government's argument drills into the facts from the "vantage point of the banks" and the homeowners. *Id.* at 6–11. In the Government's words: "Through repeated false representations and material omissions, the Aloisio Group (through QSPS) tricked the banks into giving up their interest in the

8

properties and their contractual rights against the homeowners." *Id.* at 7. As for the services offered to homeowners, the Aloisio Group's short sale service "did not exist in fact," "could not even be accomplished in any legal manner" and thus was not really a short sale business at all, despite the Aloisio Group casting it as that. *Id.* at 8.

### C. The Court's Analysis

The Government has the better of the argument. The jury found the Aloisio Group guilty of conspiracy to commit bank fraud. (ECF No. 82 at 2.) Conspiracy to commit bank fraud "is obviously inherently unlawful, but it is not the activity at issue here." *United States v. Babichenko*, No. 1:18-cr-00258-BLW, 2023 WL 349325, at *1 (D. Idaho Jan. 19, 2023). Instead, the Court must get "under the hood" and look at the specific actions that constituted the "service" provided, and whether it was "illegal" or "lawful."[3]

The PSR lays out the facts clearly. The Alosio Group (through Mr. Aloisio and Mr. DiFruscio) "falsely represented to homeowners that they could assist the homeowners in retaining their properties." (ECF No. 216 ¶ 14.) It "typically promised the homeowner (1) that they would negotiate a loan modification with the homeowner's lender, or (2) that Aloisio would acquire the property in a short sale and then sell it back to the homeowner for less than what the homeowner owed on the property." *Id.* And it "persuaded the short sale lenders to accept Aloisio Group's

---

[3] The alternative approach of just looking at what acts constituted "conspiracy to commit bank fraud" would be fruitless, because there is no lawful way to commit a conspiracy. No one argues that this approach is correct, and in any event, the statutory language draws the Court's attention to the "service" provided. *See* 18 U.S.C. § 981(a)(2)(A)-(B).

9

offers through the submission of false documents, including false Arm's-Length Transaction Affidavits, false HUD-1 Settlement Statements, and false representations regarding the marketing of the properties." *Id.* ¶ 17. And by "fraudulently inducing the lenders to approve the short sales," the Aloisio Group caused the short sale lenders to sell the properties "for substantially less than what was owed by the homeowners, resulting in loss to the short sale lenders." *Id.* ¶ 18.

Two examples show how the scheme worked in practice. Take 38 Judith Street. Before the sale, "the defendants entered into an agreement with the homeowner, Otto Alvarenga, to resell the property after the short sale to his significant other, Margarita Ortiz, for $110,000." *Id.* ¶ 35. But the Defendants "did not disclose their agreement to flip the property to Bank of America, the mortgagee." *Id.* Or take 67 Hope Street, where the Defendants "entered into an agreement with the homeowner, Herbert Ordonez, to resell the property after the short sale to him for $190,000." *Id.* ¶ 40. Again, they did not "disclose their agreement to flip the property to Bank of America, the mortgagee." *Id.* (And this time, they also "refused to sell the property back to Ordonez." *Id.*)

This conduct is "inherently unlawful." *George*, 886 F.3d at 40. The Government's comparisons to *United States v. Babichenko*, 18-cr-00258-BLW, 2023 WL 349325 (D. Idaho Jan 19., 2023), and *United States v. Milton*, 21-cr-0078, 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024), are particularly persuasive in showing why.

First, *Babichenko*. There, the court applied § 981(a)(2)(A) because the fraud scheme involved "knowingly selling counterfeit goods," and federal law specifically

10

criminalized that, "full stop." 2023 WL 349325, at *2. The case characterized the fraud as more analogous to "embezzlement, the sale of food stamps, and selling or possessing contraband cigarettes," where the broader definition of "proceeds" applied, rather than "advertising and running a business, trading stocks, operating an HVAC school, and redeeming retail coupons," where the narrower definition applied. *Id.* (footnotes collecting cases omitted).

So too here. Federal law criminalizes the predicate act of lying to the bank (the engine of the "service" provided, the act that made it work), "full stop." *Id.*; *see* 18 U.S.C. § 1344. Like Babichenko's scheme selling counterfeit goods, the only way the Aloisio Group's "service" (note the emphasis on this statutory text) could hypothetically be legal is if it offered a different "service" entirely—for instance, if it disclosed the agreements to the banks and renegotiated the mortgage, or if it conducted actual arms-lengths transactions, rather than hidden schemes to sell back to the homeowners. The Court does not read *United States v. George* to require district courts to engage in such fanciful hypotheticals that divert the Court away from the "service" actually provided. *Cf. George*, 886 F.3d at 40 ("By definition, the crime must involve a good or service that could, hypothetically, be provided in a lawful manner").

The alternative conclusion—that the Aloisio Group's scheme was a legal service provided illegally—is unconvincing. It would be like saying that the *Babichenko* court should have applied § 981(a)(2)(B) because counterfeit goods could hypothetically be sold legally, as long as the Defendants just sold non-counterfeit

11

goods instead. If that were right, § 981(a)(2)(B) could apply to everything and § 981(a)(2)(A) would cover nothing; that result is best avoided. *See, e.g.*, *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute.") Because the core of the "service" was bank fraud, and bank fraud is inherently unlawful, § 981(a)(2)(A) applies.

Similarly, the *Milton* court applied § 981(a)(2)(A) when the defendant committed wire fraud by buying a property "using stock options whose value had been inflated by his own deception." 2024 WL 779210, at *5. In the court's view, "the unlawful conduct" stemmed "from the inflated stock options themselves rather than from the manner in which Milton purchased the property." *Id.* And unlike the securities at issue in the insider trading cases (discussed below), the stocks' value "was inflated by Milton's misleading statements, and he relied on their overstated value to induce Hicks to sell him the ranch." *Id.*

Again, the parallels are notable. The Aloisio Group's "unlawful conduct" stemmed from their agreement with the homeowners to buy the properties back via a perversion of the short sale process. *Id.* And the value of the property was deflated (though not by much, as discussed more fully in other places) by the Aloisio Group's "misleading actions," actions that it "relied on . . . to induce" the banks "to sell" it the house. *Id.*

*Carpenter*, where the First Circuit applied § 981(a)(2)(B), offers a helpful contrast. 941 F.3d 1, 6–9 (1st Cir. 2019). There, a defendant's fraudulent conduct

12

was not "inherently unlawful" because the underlying business model was lawful. *Id.* at 8. That underlying business was a § 1031 property exchange intermediary company, which allows clients "to gain tax benefits" lawfully during property exchanges. *Id.* at 4. The First Circuit explained, "Advertising and running such a business are not 'inherently unlawful' activities," and "Benistar provided what could have been a 'legal service,' but which Carpenter operated in an illegal manner by misrepresenting to exchangors how their funds would be invested and investing contrary to those representations." *Id.* at 7–8. Instead, the criminal conduct "arose out of how" Carpenter "solicited customers for and made misrepresentations about his § 1031 intermediary company." *Id.* at 7.

Or consider the insider trading cases on which *Carpenter* relied. *See, e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 137–138 (2d Cir. 2012). In *Mahaffy*, the "alleged scheme involved the purchase and sale of securities." *Id.* at 138. And while trading "those securities, as a general matter, is not unlawful," the illegality occurred "when the defendants bought and sold securities as part of a scheme involving illegal bribery and frontrunning," so § 981(a)(2)(B) applied. *Id.*

*Carpenter* and *Mahaffy* are different because in this case, the "service" was predicated on fraud from the start. There was no lawful way—at least as far as the Court can tell—to accomplish all the objectives that the Defendants sought. (ECF No. 216 ¶ 14.) The only way to sell the homes back to the clients at lower rates would be to induce the banks into sales predicated on fraud.

13

Against that backdrop, the Aloisio Group's arguments favoring the application of § 981(a)(2)(B) are unconvincing.  Take for instance, its contention that because short sales themselves are lawful, the Defendants' conduct was simply provided in an "illegal manner."  As the Aloisio Group argues elsewhere in its papers, the starting point should be the "predicate act" itself.  The predicate acts for the bank fraud here are:

- Submitting false documents to lenders, including false Arm's-Length Transaction Affidavits, false HUD-1 Settlement Statements, and false representations regarding the market of the properties.  (ECF No. 216 ¶ 17.)

- Suppressing the marketing of the properties.  (ECF No. 216 ¶ 17.)

- Delaying and stalling the sales over multiple years while peppering lenders with below-market offers until the lenders accepted the Aloisio Group's offer, because it was the only one available.  (ECF No. 216 ¶ 17.)

Those predicate acts constituting bank fraud, in turn, must be placed in the larger context of the scheme.  That scheme consisted of the following actions:

- Representing to distressed homeowners that it could assist them in lawfully retaining their properties with lower rates.  (ECF No. 216 ¶ 13.)

- Entering an agreement with homeowners to resell properties back to the homeowners after the fraudulent short sale was complete.  (ECF No. 216 ¶ 13.)

- Submitting false documents to the lenders, suppressing the marketing of the properties (and thus other offers) and delaying the sale for years to induce the lender into selling to the Aloisio Group.  (ECF No. 216 ¶ 17.)

- Either selling the property back to the homeowner or retaining it.  (ECF No. 216 ¶ 13.)[4]

---

[4] Because the acts discussed in this paragraph are the predicate acts necessary for the bank fraud, the Court need not discuss the other arguments about the ancillary

14

All that shows that the fraud is at the core of the service; the service only works because of it. That, to the Court, makes it "inherently illegal." 886 F.3d at 40.

It is worth contrasting this process to how the First Circuit has described lawful short sales. *See, e.g.*, *United States v. Jimenez*, 946 F.3d 8, 8–9 (1st Cir. 2019). The bank releases its mortgage and receives the proceeds of the sale when certain conditions, including "that the sale be at arm's length (that is, between strangers), with the selling homeowner surrendering residency." 946 F.3d at 9.

What the Aloisio Group did in contrast was to "dress up loan reductions as short sales," *id.*, but dressing up one thing as another does not make it the other. The Aloisio Group's description of its business cannot alone shift the activity from one that is inherently unlawful to one that could be lawful but here was provided illegally. Analogous to how the Fifth Circuit in *Davis* rejected the idea that statutory titles are meaningful parts of the analysis, the Court believes that using the Aloisio Group's characterization of the fraud as evidence of its hypothetical lawfulness is misguided. *Cf. George*, 886 F.3d at 40 ("The defendant's attempt to place embezzlement under the carapace of section 981(a)(2)(B) rests on a mis-identification of his criminal conduct. His crime was not the provision of bus services in an illegal manner but, rather, the misappropriation of government resources to his own behoof.") The statutory text says to focus on the "services" provided, not the defendant's "description of the service." 18 U.S.C. § 981(a)(2)(A).

---

services provided by the Aloisio Group, such as property maintenance. The central "service" at issue, the one that led to the conviction, was "inherently illegal."

15

Put more simply, the Aloisio Group's crime was not the provision of short sales in an illegal manner but dressing up "inherently unlawful" bank fraud as short sales. So the fact that short sales are legal is irrelevant, because the Aloisio Group did not offer an illegal spin on short sales. At its core, it offered something else and just called it a short sale business. That cannot reduce its liability. To accept the contrary would be to create a loophole in the statute, where defendants could avoid greater liability by characterizing their fraud as lawful. That result is best avoided. *See George*, 886 F.3d at 40l; *Ramsdell*, 107 U.S. at 152.

Finally, the purpose of criminal forfeiture supports application of the broader definition of "proceeds." *See Milton*, 2024 WL 779210, at *6. As the Supreme Court has explained, criminal forfeiture statutes "serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic power of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (cleaned up). "Those purposes would not be served by allowing" the Aloisio Group "to effectively reverse the outcome of a fraudulent transaction following a jury conviction." *Milton*, 2024 WL 779210, at *6. That is particularly true when the Aloisio Group contends that it really lost money on the fraud, (ECF No. 240 at 14), despite still maintaining two of the properties. The Court shares the Government's skepticism of that analysis.

The Court thus holds that § 981(a)(2)(A) applies. The Aloisio Group's bank fraud, the core part of its scheme, is "inherently illegal," and its scheme was thus an

16

"illegal service" rather than a "lawful service" that was "provided in an illegal manner." *George*, 886 F.3d at 40. No more is needed.[5] Because the Court finds that the broader definition of "proceeds" applies, its original order stands. The stay on the forfeiture order is lifted.

IT IS SO ORDERED.

*Mary S. McElroy*
_____
Mary S. McElroy,
United States District Judge

August 22, 2025

---

[5] The Court need not delve into recalculating the forfeiture total, but it commends the parties for their thoroughness in assembling the record (as to the Aloisio Group) and for responding to it (as to the Government) both thoughtfully and quickly.

17