UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 21-cr-27-MSM-PAS |
| ) | |
| GREGORY ALOISIO, et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER

This order is another piece of an exhaustive post-trial process lasting more than two years. The post-trial process has included at least twelve distinct hearings and conferences with the Court about a range of issues, and with that, an immeasurable amount of time and energy spent by the parties and the Court.

At the Defendants' June 9, 2025, sentencing, the Court deferred on the amount of restitution. It ordered the Government to provide more documents about restitution owed to the Federal Housing Authority ("FHA"). The Government did so via email on June 16, and the Defendants objected via email on June 17.[1] *See* Ex. A. More emails ensued. *See* Ex. B. At the Defendants' suggestion, the Court held an on-the-record conference discussing restitution on June 26. Following that conference, the parties provided additional documentation and statements of position

---

[1] For the parties' convenience, the Court has attached the relevant emails as exhibits to centralize the record, but the Court does not include any documents attached to those emails.

to the Court via email, and one party raised a clarifying question. *See* Ex. C., Ex. D. Via a law clerk, the Court answered that question and raised an additional inquiry to the parties. *See* Ex. E. The parties responded via email, *see* Ex. F., and the Court then held a second on-the-record status conference discussing restitution on July 17. The Court needed additional documentation from the Defendants, and they provided it via email on July 18. *See* Ex. G.

Having given all parties every opportunity to make their case, the Court now makes its decision. The Court ORDERS that the Defendants collectively owe $102,692 in restitution. It is apportioned so that Mr. Alosio and the Aloisio Group shall pay $97,692 in restitution and that Mr. DiFruscio shall pay $5,000. Below, the Court explains why.

## I.  RESTITUTION STANDARD

Under the Mandatory Victims Restitution Act ("MVRA"), defendants convicted of certain federal crimes—including (as relevant here) those "committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii)—must make restitution to their victims to compensate the victims for their actual losses. *United States v. Carrasquillo-Vilches*, 33 F.4th 36, 45 (1st Cir. 2022).

"An 'actual loss' in the MVRA context is limited to the pecuniary harm that would not have occurred but for the defendant's criminal activity." *Id.* at 45–46 (cleaned up). Notably, "for this purpose, intended loss will not suffice." *Id.* at 46. Likewise, "rough approximations that do not sufficiently reflect . . . the losses of the

victims are not appropriate grist for the restitution mill."[2] *United States v. Simon*, 12 F.4th 1, 65 (1st Cir. 2021) (cleaned up). And "restitution orders should not generate windfalls," because the "principal goal of restitution is to make the victim whole again," rather than punish the defendant. *Carrasquillo-Vilches*, 33 F.4th at 46 (cleaned up).

From that, it is clear that this standard has "some teeth." *Simon*, 12 F.4th at 65. It "obligates the government to show both that the particular loss would not have occurred but for the conduct undergirding the offense of conviction and that a causal nexus exists between the loss and the conduct—a nexus that is neither too remote factually nor too remote temporally." *Id.* at 64. A preponderance of the evidence standard applies, and the Government bears the burden. *Id.* at 65.

The First Circuit has also explained that the Court's calculation "is not held to standards of scientific precision." *United States v. Sanchez-Maldonado*, 737 F.3d 826, 828 (1st Cir. 2013). So as "long as the court's order reasonably responds to some reliable evidence, no more is exigible." *United States v. Naphaeng*, 906 F.3d 173, 180 (1st Cir. 2018). And although restitution is "serious business," attempts to quantify it "should not be allowed to spawn mini-trials." *Simon*, 12 F.4th at 64.

---

[2] *Simon* here quotes in part from *United States v. Innarelli*, a 2008 First Circuit case. 12 F.4th at 65. *Innarelli* was superseded by an amendment to the Sentencing Guidelines, as the First Circuit recognized in *Carrasquillo-Vilches*. 33 F.4th at 43. But *Innarelli*'s holding that was superseded was related to Guideline loss calculation, not restitution. *See id.* So the Court reads the "grist" statement to remain good law.

## II.   CALCULATION

The Court has heard plenty from the parties about calculating the costs of the Defendants' actions in the contexts of sentencing, forfeiture, and now restitution. For sentencing, the Government urged the Court to adopt a loss number of $564,541, derived from the Pre-Sentencing Report (PSR). *See, e.g.*, ECF No. 214 ¶ 29.[3] The Court used that number as a starting point but disagreed with the Government about several individual items, bringing the loss figure (for Guideline purposes) to $425,712. The Court explained its decision in hearings on June 4, 2025, and June 9, 2025, and it will not recount its rationale here except as necessary.

The Government largely urges the Court to adopt the PSR figure to determine restitution. It mainly argues that the restitutionary loss for financial institutions—a particularly contested point here—should be determined by subtracting the closest-in-time offer predating the short sale from the short sale, the difference being the most accurate figure of loss. It casts its approach as more conservative than the First Circuit's in the context of calculating loss for Guidelines purposes in *United States v. Jimenez*, 946 F.3d 8, 12–15 (1st Cir. 2019), and consistent with the Eighth Circuit's decision in *United States v. Engelmann*, 720 F.3d 1005, 1015–16 (8th Cir. 2013), what it identifies as the closest persuasive authority. And it suggests that restitution as to other people and organizations should track loss as calculated in the PSR, bringing the total to $564,541.

---

[3] Note that the PSR's calculation (ECF No. 24 ¶ 29) is $566,541, which is $2,000 higher than the total the Government pursued. That higher PSR figure can be attributed to a clerical error corrected during the sentencing process.

4

The Defendants, in turn, argue that the financial institutions are hardly victims. In their view, the loss figures overvalue the victims' actual losses resulting from the Defendants' conduct amid a volatile housing market. Instead, the Defendants urge the Court to decline to impose restitution because it has led to the "complication and prolongation of the sentencing process," a burden which here "outweighs the need to provide restitution to any victims." 18 U.S.C. § 3663(a)(1)(B)(ii). They also suggest that the difference between close-in-time independent appraisals and the short sales better estimate loss by victims. Finally, they also make arguments about the credibility of the Government's evidence related to restitution for specific properties and people.

To start, the Court's previous determination of loss for purposes of calculating the Defendants' offense level under the Guidelines is an imperfect fit here. The Court reaches that conclusion given the First Circuit's guidance, particularly the prohibition on windfalls, the caution against "rough approximations," and what seems to be a stricter but-for nexus causation standard in the restitution context than in the Guidelines context. *Simon*, 12 F.4th at 64 (windfalls); *id.* at 65 (rough approximations); *id.* at 64 (nexus); *see also Carrasquillo-Vilches*, 33 F.4th at 46. These stricter maxims create a more rigorous calculation. Not lost on the Court either are the real consequences of a restitution order—that the Defendants must pay this money—as compared to the abstract loss calculation as part of the non-binding Guidelines calculation. *See, e.g.*, 18 U.S.C. § 3663A(d); *id.* § 3664(h) (noting that, at

5

least in the apportionment context, real-life context like contribution and the defendants' economic circumstances may be considered).

Turning next to the Government's caselaw, neither *Jimenez* nor *Engelmann* are on all-fours. Instead, the Court sees those cases as having some value here but not being decisive. Starting with *Jimenez*, that case concerned calculating loss for Guidelines purposes, rather than restitution. 946 F.3d at 12–13. That analysis encompassed both actual and intended loss, whichever the greater, rather than just actual loss. *Id.* Not so here, where the inquiry is more limited. 33 F.4th 45–46.

Also relevant are the different circumstances surrounding the scheme. Jimenez's scheme was different from the Defendants', particularly for restitutionary purposes, because in *Jimenez* there was "no substantial evidence either that any of the homeowners had stopped making payments other than as a ploy in the course of the fraud or that they could not continue making payments going forward." *Id.* at 13.

Not so here, as both parties have emphasized throughout the litigation. The Government has highlighted that the Defendants specifically went after distressed homeowners. *See, e.g.*, ECF No. 222 at 1–4, 9. The Defendants insist that they, in doing so, kept those distressed homeowners in their homes while also saving banks from having to undertake foreclosure proceedings. *See, e.g.*, ECF No. 225 at 4–5, 27. The Court believes that this distinction matters insofar as the victims' restitution must be read against the context of the possible alternative loss that they all would have suffered: foreclosures, as well as the processes, penalties, and burdens that necessarily follow. *Cf. Jimenez*, 946 F.3rd at 14 (considering alternatives to what

6

would have happened "but for the fraudulent short sales" in fashioning the appropriate formula).

As for *Engelmann*, the Court thinks it is more relevant on some issues. For one, it considers restitution rather than loss under the Guidelines. 720 F.3d at 1014–16. The defendant in *Engelmann* argued that banks could not be victims in mortgage fraud cases "because they are bad actors whose conduct caused the sub-prime mortgage crisis." 720 F.3d at 1014. The Defendants' argument, made more extensively at sentencing but arguably still relevant here, is more nuanced but sounds in the same register. They contend that the Government pursued the Defendants more vigorously here than it did the large-scale banks who (1) were at the center of the 2008 sub-prime mortgage crisis and (2) are now claiming to be victims.

Like the Eighth Circuit, the Court disagrees with the Defendants: the MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). No matter their involvement in the 2008 crisis, the financial institutions fit that definition: for many properties, they clearly lost the difference between an independent appraiser's valuation and the short sale price. (More on that below.)

But on other issues, *Engelmann* is not that helpful. Citing *Engelmann* and its focus on lost profits, the Government argues that the difference between an

7

outstanding (but suppressed) offer and the short sale is the proper method of calculating loss for restitution purposes.  720 F.3d at 1015–16.

Yet there is a key difference between the lost profits in *Engelmann* and what the Government sees as lost profits here.  Engelmann's scheme turned on "dual price" purchasing agreements, where the buyer and the seller "provided lenders with inflated sales prices to secure higher loan amounts."  *United States v. Engelmann*, 701 F.3d 874, 875 (8th Cir. 2012).[4]  As the Eighth Circuit put it: "The actual sales prices were lower than the amounts provided to the lenders, and the buyers pocketed the difference.  All nine mortgages went into first payment default, and the properties were sold at foreclosure."  *Id.*  From that dual price scheme, it followed that, to "the extent that the government proved a victim was entitled to collect the payments on a particular mortgage, subtracting the price paid at a sheriff's sale or short sale of the property (i.e., the amount the victim actually collected) from the unpaid loan balance (i.e., the amount the victim was entitled to collect) would reflect the amount of profit the victim lost on that particular mortgage."  720 F.3d at 1015.

In contrast, the Defendants cast their conduct as a form of "short sale."[5]  The First Circuit has explained what that entails, and the Court borrows its explanation:

---

[4] Mr. Engelmann's ordeal produced two opinions: *United States v. Engelmann*, 701 F.3d 874 (8th Cir. 2012) and *United States v. Engelmann*, 720 F.3d 1005 (8th Cir. 2013).  The Government relies on the second because it deals with restitution, but the first offers some closer insight into the nature of the scheme.

[5] As discussed in a separate order on forfeiture, whether the Defendants' conduct really constituted a "short sale" business for purposes of defining whether it was an inherently unlawful activity or a lawful activity done in an illegal manner is a

8

> Sometimes, borrowers and lenders find it in their mutual interest to sell an underwater home for less than the borrower owes on the note. In such a transaction, known as a "short sale," the bank releases its mortgage, receives only the proceeds of the sale, and often forgoes pursuing the borrower for the deficiency on the note. Before agreeing to cut their losses in this way, banks often insist on certain conditions. Those conditions include, among other things, that the sale be at arm's length (that is, between strangers), with the selling homeowner surrendering residency. If the conditions are not met, a bank can refuse to approve the short sale and might well opt to see if the borrower's desire to avoid foreclosure and stay in the home causes the borrower to continue making payments.

*Jimenez*, 946 F.3d at 11.

Of course, the Defendants perverted this process so significantly that it could be difficult to cast their scheme even as a short sale. The Defendants falsely represented to distressed homeowners that they could assist the homeowners in retaining their properties, despite the risk of default. (ECF No. 214 ¶ 14.) Sometimes the homeowner wanted to short sell the property, but the Defendants "typically promised the homeowner (1) that they would negotiate a loan modification with the homeowner's lender, or (2) that Aloisio would acquire the property in a short sale and then sell it back to the homeowner for less than what the homeowner owed on the property." *Id.*¶ 15. Sometimes that sell-back included a rent-to-buy provision, one that was "higher, sometimes substantially higher, than the short sale" that the defendants negotiated with the short sale lender, even though the Defendants did not disclose them. *Id.* ¶ 17.

Recall that the usual short sale must include the lender's approval. Here, the Defendants "persuaded the short sale lenders to accept their officers through the

---

separate issue and a separate analysis. The Court's use of the term "short sale" here to describe their conduct should be read as shorthand unrelated to that analysis.

9

submission of false documents, including false Arm's-Length Transaction Affidavits, false HUD-1 Settlement States, and false representations regarding the marketing of properties." *Id.* ¶ 18. The Defendants also suppressed the marketing of properties and sometimes delayed sales for years until the lender accepted the offer. *Id.* While these "protracted, false negotiations" went on, the Defendants "collected and kept the rent money generated by the properties." *Id.*

The harm? Qualitatively, "by fraudulently inducing the lenders to approve the short sales to [the] Aloisio Group, the short sale lenders sold the properties for substantially less than what was owed by the homeowners, resulting in losses to the shareholders." *Id.* ¶ 19. Sometimes, "the FHA reimbursed the short sale lenders, thereby incurring the loss." *Id.* But importantly, the PSR recognized that "because the homeowners were in default, not all those losses can be attributed to the scheme." *Id.* That is critical to the analysis. *Simon*, 12 F.4th at 64–65; *cf. Jimenez*, 946 F.3rd at 14.

All that is to say: there are notable differences between these cases illustrating why *Engelmann*'s "lost profits" figure does not map on well here. Among them: (1) that in *Engelmann*, the properties were sold at foreclosure, while here, foreclosure was avoided; (2) that the *Engelmann* parties and courts focused on unpaid loan balance as part of the equation, while here, the parties instead argued about the relationship of different pre-fraud figures to the short sale price; (3) that Engelmann inflated the home prices, sold them off, and pocketed the difference, while the Defendants here suppressed the market to keep the properties in their own

10

possession or in the possession of the original homeowners; and (4) the PSR here cuts against the Government's position that all losses (in its view, the difference between the suppressed offer and the short sale) are attributable to the Defendants' actions; in *Engelmann*, that was not an issue (at least based on the Court's review of it). So the "lost profits" in *Engelmann* are thus different in kind than the lost profits that the Government wants here.

The Court holds that, for restitutionary purposes, the best metric for determining loss is looking at a close-in-time independent appraisal and comparing it to the short sale price. That approach is consistent with the restitution caselaw by focusing strictly on actual loss through a but-for causation lens, by avoiding "rough approximations" via untested offers, and by mitigating any potential windfall. *Carrasquillo-Vilches*, 33 F.4th at 46; *Simon*, 12 F.4th at 64. The approach also comports with *Jimenez* by "first estimating what the banks would have foreseeably realized but for the fraud and then subtracting what they in fact received as a result of the short sales." 946 F.3d at 14. To make the point more clearly, the Court agrees with the Government that *Jimenez* is instructive here but disagrees with the Government about the best benchmark for what the banks "would have foreseeably realized but for the fraud" while also following the restitution caselaw. *Id.*

Compared to the offer, the independent appraisal is a better benchmark for several reasons. First, the Defendants persuasively argue that some of the offers cited by the Government could reasonably construed as part of the fraud, like the case with 38 Judith Street. The difference between the suppressed offer—really a part of

11

the scheme with the Aloisio Group—and the short sale is thus a shaky foundation for reasonable, foreseeable loss. Second (and closely related) an independent appraisal is, by its nature, a better marker of a "reasonable" outcome than an offer possibly tainted by fraud and certainly made in strange market conditions. As the Defendants' counsel made clear at sentencing, independent appraisals are an industry distinct from the real estate market and thus less likely to be contaminated by fraud. Third, the Court's formula more fairly accounts for the alternatives, as *Jimenez* requires. After all, if the fraud had not occurred and the distressed properties went into foreclosure (a foreseeable outcome worth considering, per *Jimenez*) an independent appraisal would have carried more weight in the foreclosure sale than any given offer. Finally, the independent appraisal benchmark better ensures that there is no windfall because of its distance from the scheme.

Thus, in the subsequent table, the Court calculates the restitution as to the financial victims by subtracting the short sale price from the closest-in-time independent appraisal.

As for losses to individual people and properties, the Court largely (but not entirely) follows its findings at sentencing. Notably, because restitution cannot provide a windfall, the Court cannot order $40,149 in restitution to Jose Infante despite previously including that in the Guideline loss calculations. The documents from the Defendants adequately establish that the Aloisio Group and its subsidiary, Quiet Storm Property Service, rendered $105,838.71 in services to Mr. Infante's property while they managed it for him. A majority of these payments took place

during the relevant period of 2014 through 2019. To boot, the Defendants provide a City of Providence Department of Inspections notice, bolstering the importance of their efforts in upkeeping the home. Forcing the Defendants to pay $40,149 in supposedly lost rent after they and Mr. Infante signed a contract to manage the property (involving also their collection of rent) and after the Defendants expended over $100,000 in upkeep on the property and remedied housing violations, would indeed prove a windfall for Mr. Infante.

With all that in mind, the Court finds that the Defendants owe $102,692 in restitution. An itemized chart follows.

| Restitution Amounts (cont'd on next page) | | |
|---|---|---|
| Victim | Restitution | Description |
| Bank of America | $37,000 | - $27,000 loss on 38 Judith St. (the difference between the $77,000 independent appraisal on February 13, 2012, and the $50,000 short sale on May 11, 2012);<br>- $10,000 loss on 67 Hope St. (the difference between the $165,000 independent appraisal on July 11, 2011, and the $155,000 short sale on October 14, 2011). |
| Hector Garcia | $26,200 | - $1,200 fee for Defendants' assistance with 74 Pomona St.;<br>- $25,000 deposit for the same. |
| Margarita Ortiz and Otto Alvarenga | $22,000 | - Lost down payment for 38 Judith St. |
| Fay Servicing | $10,000 | - $5,000 loss on 4 Clarendon St. (the difference between Fay's $195,000 "interior valuation received" on May 5, 2017, and the $190,000 short sale on August 11, 2017);<br>- $5,000 loss on 117 Shaw Ave. (the difference between the $185,000 independent appraisal on November 22, 2016, and the $180,000 short sale on March 30, 2017). |
| FHA | $5,092 | - $0 loss on 72-74 Princeton St. (the difference between the $74,000 independent appraisal on April 2, 2011, and the $74,000 short sale on September 6, 2011);<br>- $3,500 loss on 90 Old Oak Ave (the difference between the $134,000 independent appraisal on December 6, 2016, and the $130,500 short sale on June 30, 2017);<br>- $1,592 loss on 158-58 Merino St. (the difference between the $119,000 independent appraisal on August 4, 2011, and the $117,408 short sale on December 30, 2011). |

| Restitution Amounts (cont'd from previous page) | | |
|---|---|---|
| Herbert Ordonez | $1,200 | Fee collected for Defendants' assistance with 67 Hope St. |
| Jose Infante | $1,200 | Fee collected for Defendants' assistance with 152-154 Mass. Ave. |
| **TOTAL:** | $102,692 | |

### III.   APPORTIONMENT

The question remains as to how the restitution amount should be apportioned between the Defendants.  "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C § 3664(h); *see also United States v. Salas-Fernandez*, 620 F.3d 45, 49 (1st Cir. 2010) ("A sentencing court has some discretion as to how restitution should be apportioned among multiple defendants.  The court may consider, among other things, the relative culpability of those responsible for the loss.  In the last analysis, however, the court is not required to use any particular formula for apportionment or, indeed, to apportion the loss at all.") (cleaned up).

The Court finds that Mr. Aloisio and the Aloisio Group will bear the brunt of the restitution.  That determination is based on both Mr. Aloisio's culpability and his

15

economic circumstances, which here bleed together: as the head of the Aloisio Group, the primary beneficiary of the fraud, and the one who still possesses properties involved in the scheme, he is in the best position to make victims whole. By contrast, Mr. DiFruscio, though working as an agent for the Aloisio Group, did not financially benefit from the scheme in nearly the same way—again, bearing on both culpability and economic circumstances.

Mr. Aloisio and the Aloisio Group will pay $97,692, and Mr. DiFruscio will pay $5,000. Mr. Aloisio, the Aloisio Group, and Mr. DiFruscio will be jointly and severally liable for Mr. DiFruscio's portion of the restitution. The Defendants shall pay the restitution first to the personal victims, then to the financial institutions.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

August 22, 2025